***********
Upon review of the competent evidence of record, with reference to the errors assigned, and considering the briefs and oral arguments of the parties, the Full Commission finds no good grounds to receive further evidence, or to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full Commission affirms, with modifications, the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as:
 STIPULATIONS *Page 2 
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all times relevant to these proceedings.
2. An employment relationship existed between the parties at all times relevant to these proceedings.
3. Defendant-Carrier provided workers' compensation insurance coverage to Defendant-Employer at all times relevant to these proceedings.
4. Plaintiff's average weekly wage is to be determined by a Form 22 to be provided by Defendants with supporting wage information.
5. On or about August 15, 2008, Plaintiff sustained an injury to his cervical spine, with the exact date to be determined by the North Carolina Industrial Commission.
6. The injury arose out of and in the course of employment and is compensable.
7. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Pre-Trial Agreement;
 b. Stipulated Exhibit Two: North Carolina Industrial Commission forms and filings;
 c. Stipulated Exhibit Three: Discovery responses;
 d. Stipulated Exhibit Four: Plaintiff's medical records;
 e. Stipulated Exhibit Five: Video depicting individuals performing the job duties which Plaintiff performed for Defendant-Employer, received following the hearing before the Deputy Commissioner.
 *********** ISSUE *Page 3 
The issue to be determined is whether Plaintiff contracted an occupational disease as a result of his employment duties with Defendant-Employer, and if so, to what workers' compensation benefits is he entitled?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 50 years old, with a date of birth of February 9, 1960. Plaintiff has a high school diploma, but no other formal education. In 1979, Plaintiff began his employment with Defendant-Employer. Other than a six-month lay-off in 1982, Defendant-Employer continuously employed Plaintiff for almost 30 years.
2. The division of Defendant-Employer where Plaintiff works is an automotive division which manufactures fuel injectors and pumps. For approximately 14 years, Plaintiff worked for Defendant-Employer as an analyzer, which did not involve reaching above shoulder level. During the next 11 years or so of Plaintiff's employment with Defendant-Employer, he worked as an assembler. When Plaintiff began work as an assembler, he performed operations dealing only with the cyclops stage of the assembly process. In that position, Plaintiff reached straight out in front of him and placed fuel injectors onto the cyclops machine. However, these duties did not require reaching above shoulder level either.
3. During the last two of Plaintiff's 11 years as an assembler, he worked in a horseshoe cell configuration performing operations in five different assembly stages: seat leaking; cyclops; protective caps; t-boot; and camera. The parties stipulated into evidence a video depicting several individuals performing the duties and operations in the five different *Page 4 
assembly stages performed by Plaintiff in the horseshoe cell. Plaintiff also testified about his duties and how he contended that they differed from those depicted in the video.
4. In the seat leaking assembly stage, Plaintiff would place a fuel injector into the seat leaker to test oil pressure and then take it off using his right hand, which he would rotate to position the injector. Plaintiff would then spin the fuel injector to tighten it, and then would twist it off, and move it to the next station. In the cyclops assembly stage, Plaintiff would place the fuel injectors onto a turn table, where the machine would apply a carbon seal. Plaintiff would then remove the fuel injector and pass it onto the next operation. Plaintiff performed this task with his right hand, with the machine straight in front of him and slightly below shoulder level.
In the protective caps assembly stage, Plaintiff applied protector caps to the tip and fuel inlet of the fuel injectors. In the t-boot assembly stage, Plaintiff would put fuel protector onto the fuel injectors, and then the injectors would be placed onto a machine and tightened down, sometimes with a wrench. Plaintiff performed the work at this stage at around waist level, and would primarily use his right hand and arm. In the camera assembly stage, Plaintiff would place the fuel injectors into a device with a camera that would scan for errors, and then the injector would be dropped into a chute and fall into a container. Plaintiff would then pick up the fuel injectors from the container into which they fell, would bag them according to the order, and would place them into a box. Plaintiff had to package some fuel injectors individually, and others either 20 to a bag or 50 to a bag.
5. According to Plaintiff, he performed each of the tasks in the horseshoe cell configuration approximately 733 times per eight-hour work day. The only station at which Plaintiff would perform any reaching above the shoulder level was at the camera station. While moving the fuel injectors from the container into the bags and boxes at the camera station, *Page 5 
Plaintiff sometimes had to reach above the shoulder, depending upon the model of fuel injector. When Plaintiff worked with the fuel injectors requiring individual packaging, Plaintiff would reach above shoulder level as he transferred the fuel injectors from the container to the boxes. Plaintiff would spend between five and seven minutes at a time at the camera station, and reached above shoulder level between 10 and 15 times. Approximately 50 minutes out of an eight-hour work day would be spent at the camera station, and of that time, approximately one-third would involve the fuel injectors which potentially required reaching above shoulder level.
6. On August 20, 2008, Plaintiff presented to Dr. Charles Henry Classen, Jr., an orthopaedist, with complaints of right shoulder pain for the past month. Plaintiff attributed his right shoulder pain to repetitive bending and lifting at work. In addition, Plaintiff reported that his right shoulder pain radiated across his back, into his opposite shoulder, and down into his right hand. Dr. Classen diagnosed Plaintiff with cervical pain and right shoulder impingement syndrome, administered an injection, prescribed medication and physical therapy, and issued light-duty work restrictions of no lifting over 20 pounds with the right arm.
7. On August 28, 2008, Plaintiff underwent a cervical MRI, which revealed a small osteophytic complex with mild central stenosis. On August 29, 2008, Plaintiff returned to Dr. Classen, at which time he reported no improvement in his right shoulder pain. Since Plaintiff did not feel that any of Dr. Classen's treatment recommendations were helping him, Dr. Classen recommended a neurosurgical evaluation. Dr. Classen continued Plaintiff's previous light-duty work restrictions.
8. On September 30, 2008, Plaintiff presented to Dr. Scot Eric Reeg, an orthopaedist, with complaints of stabbing pain in his shoulders while bending over lifting fuel injectors at work on August 5, 2008. Dr. Reeg diagnosed Plaintiff with cervical degenerative *Page 6 
disc disease and right radiculopathy, and continued the light-duty work restrictions previously issued by Dr. Classen. On October 6, 2008, Plaintiff returned to Dr. Reeg, who reviewed the August 28, 2008 cervical MRI. He felt that the MRI revealed no significant spinal cord pressure. Dr. Reeg recommended a right shoulder MRI, and continued Plaintiff's light-duty work restrictions.
9. On October 21, 2008, Plaintiff underwent a right shoulder MRI, which revealed a small rim rent tear at the infra-spinatus tendon, as well as tendinosis of the supra-spinatus and infra-spinatus tendon. On October 30, 2008, Dr. Reeg recommended that Plaintiff be seen by an orthopaedist with a specialty in upper extremities, and continued his light-duty work restrictions.
10. Plaintiff continued to work for Defendant-Employer until October 2008. When the economy took a downturn, Plaintiff volunteered for a one-month furlough, and then returned to work in November 2008, but only worked for one day. On November 3, 2008, Defendants admitted the compensability of Plaintiff's cervical spine condition via a Form 60, and denied the compensability of his right shoulder condition via a Form 61. Although Plaintiff was capable of working with light-duty restrictions, he received Defendant-Employer funded short-term disability compensation for the next three and a half months because Defendant-Employer had no work available for him within his restrictions. On March 6, 2009, Defendant-Employer laid Plaintiff off due to the continued economic downturn.
11. On November 11, 2008, Plaintiff presented to Dr. Barton Stephenson Arthur, an orthopaedist, at which time he reported having pain ever since picking up something at work on August 5, 2008. Dr. Arthur noted that Plaintiff's MRI revealed a partial thickness tear at the supra-spinatus insertion and a Type II superior labrum from anterior to posterior (SLAP) tear. Dr. Arthur recommended surgery. *Page 7 
12. On December 3, 2008, Dr. Arthur performed arthroscopic surgery on Plaintiff, including a superior labral repair. Dr. Arthur's post-surgical diagnosis was a Type II labral tear. Dr. Arthur saw no abnormality of the rotator cuff during the surgery, except for some mild undersurface fraying which did not require surgical intervention.
13. On December 12, 2008, Plaintiff returned to Dr. Arthur, who noted that Plaintiff was doing well post-operatively, and removed his sutures. On January 6, 2009, Plaintiff returned to Dr. Arthur again. Although Dr. Arthur felt that Plaintiff had good range of motion, he continued to complain of pain in his right shoulder.
14. On January 15, 2009, Plaintiff returned to Dr. Reeg. At that time, Dr. Reeg was of the opinion that Plaintiff was not a candidate for reconstructive cervical spine surgery. Dr. Reeg noted some symptom magnification and some non-physiological findings that he felt made the overall examination unreliable. Dr. Reeg found that Plaintiff was at maximum medical improvement with respect to his cervical spine complaints and released him to return to work without any restrictions with respect to his cervical spine. At Dr. Reeg's deposition, he indicated that he had no opinions regarding Plaintiff's right shoulder condition.
15. On March 2, 2009, Plaintiff presented to Dr. Sean Shiao-Fong Hsu, a neurosurgeon, for a second opinion with respect to his cervical spine complaints. Dr. Hsu ordered a cervical MRI. On March 5, 2009, Plaintiff returned to Dr. Hsu, who noted that the cervical MRI revealed no clear etiology for intra-spinal neural compression. Dr. Hsu ordered electromyography and nerve conduction studies.
16. On March 17, 2009, Plaintiff underwent the electromyography and nerve conduction studies ordered by Dr. Hsu, which revealed no evidence of radiculopathy or neuropathy. On March 23, 2009, Plaintiff returned to Dr. Hsu. Dr. Hsu did not think that *Page 8 
Plaintiff's cervical spine complaints required either surgery or injections and he recommended follow-up with Dr. Arthur for further evaluation of his right shoulder complaints.
17. On March 26, 2009, Plaintiff returned to Dr. Arthur, who recommended an arthrogram. On April 6, 2009, Plaintiff underwent an arthrogram, which revealed a large SLAP tear with extension into the anterior labrum and the biceps anchor. On April 9, 2009, Plaintiff returned to Dr. Arthur again. Based upon the arthrogram results, Dr. Arthur recommended that Plaintiff undergo a repeat arthroscopic surgery.
18. On April 24, 2009, Plaintiff underwent another arthroscopic surgery to repair the re-tear of the labrum in his right shoulder. During the surgery, Dr. Arthur noted no major abnormality of Plaintiff's rotator cuff, and the biceps tendon was stable at its anchor to the top of the glenoid. Post-operatively, Plaintiff did well and successfully participated in physical therapy.
19. On September 24, 2009, Plaintiff returned to Dr. Arthur for the last time. Although Plaintiff continued to have some occasional right shoulder pain, Dr. Arthur found him to be at maximum medical improvement with respect to his right shoulder condition. Dr. Arthur did not recommend any further medical treatment or assign any specific physical restrictions or permanent partial disability to Plaintiff's right shoulder.
20. At Dr. Arthur's deposition, he explained that the focus of the two surgeries he performed on Plaintiff's right shoulder was the repair of the labral tears. Dr. Arthur did not undertake any specific repair of the rotator cuff during either surgery because it did not require surgical intervention. Plaintiff would have needed the two surgeries to repair the labral tears regardless of the existence of the partial thickness rotator cuff tear. According to Dr. Arthur, the labral tears and the partial thickness rotator cuff tear were two separate injuries. *Page 9 
21. After reviewing the videotape of Plaintiff's employment duties and listening to Plaintiff's counsel summarize Plaintiff's testimony concerning his job duties, Dr. Arthur opined that Plaintiff's employment duties placed him at "possibly a slightly increased risk" for developing the partial thickness rotator cuff tear that he treated. In addition, based upon the information provided to Dr. Arthur regarding Plaintiff's employment duties as an assembler in the horseshoe cell, he opined, and the Full Commission finds as fact, that such work was suitable for Plaintiff, with the exception of lifting boxes above shoulder level. Other than the restriction on lifting above shoulder level, Dr. Arthur was of the opinion, and the Full Commission finds as fact that Plaintiff could return to work.
22. According to Dr. Arthur, rotator cuff tears can be caused by repetitive motion, and it is "possible" that a rotator cuff tear could cause weakness in the shoulder, contributing to the development of a labral tear. However, Dr. Arthur could not state with any degree of medical certainty that Plaintiff's partial rotator cuff tear caused or contributed to his labral tear. Dr. Arthur did opine that it was "likely" that Plaintiff's employment duties caused his partial thickness rotator cuff tear.
23. The Full Commission finds, based upon the greater weight of the evidence that Plaintiff failed to prove that his right partial thickness rotator cuff tear and labral tears are compensable occupational diseases or the result of an injury by accident.
24. The Full Commission finds, based upon the greater weight of the evidence that on August 5, 2008, Plaintiff sustained a compensable injury by accident and/or specific traumatic incident of the work assigned arising out of and in the course of his employment with Defendant-Employer to his cervical spine. The Full Commission further finds that as of January 15, 2009, Plaintiff was at maximum medical improvement with respect to his cervical spine condition, and *Page 10 
does not have a permanent partial disability rating or permanent work restrictions with respect to his cervical spine.
25. The medical treatment Plaintiff received for his August 5, 2008 work injury to his cervical spine was reasonably required to effect a cure, to give relief, and/or to lessen his period of disability. Dr. Reeg released Plaintiff from his care for his cervical spine condition and recommended no further medical treatment at the time.
26. The Full Commission finds, based upon the greater weight of the evidence that Plaintiff failed to prove disability with respect to his August 5, 2008 work injury to his cervical spine. Specifically, Plaintiff failed to prove any of the following: that he is medically disabled from any employment, as no treating physician ever removed him from work or placed any type of restrictions on him due to his cervical spine condition; that he made any effort to search for suitable employment; that it would be futile for him to search for suitable employment; or that he obtained employment at a wage less than his pre-injury wage.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In Rutledge v. Tultex Corp./King's Yarn, the Supreme Court of North Carolina held that in order for an occupational disease to be compensable under the North Carolina Workers' Compensation Act, a plaintiff must prove that the claimed disease is: "(1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection *Page 11 
between the disease and the [plaintiff's] employment."Rutledge v. Tultex Corp./King's Yarn,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). In cases where the employment exposed the worker to a greater risk of contracting the disease than the general public, the first two elements are satisfied. Rutledge, 308 N.C. at 93-94, 301 S.E.2d at 365.
2. Plaintiff failed to meet his burden of proving that his right partial thickness rotator cuff tear and the labral tears for which he required surgery are compensable occupational diseases or resulted from an injury by accident. Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000);Rutledge, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983).
3. On August 5, 2008, Plaintiff sustained an admittedly compensable injury by accident and/or specific traumatic incident of the work assigned arising out of and in the course of his employment with Defendant-Employer to his cervical spine. N.C. Gen. Stat. § 97-2(6) (2009).
4. Plaintiff is at maximum medical improvement with respect to his cervical spine condition.
5. The medical treatment Plaintiff received with respect to his August 5, 2008 work injury to his cervical spine was reasonably necessary in order to effect a cure, to give relief, and/or to lessen his period of disability, and Defendants are obligated to pay for such treatment. However, Plaintiff is not entitled to any further medical treatment for his cervical spine condition at this time. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1 (2009).
6. Plaintiff failed to prove disability with respect to his August 5, 2008 work injury to his cervical spine. Specifically, Plaintiff failed to prove any of the following: that he is medically disabled from any employment, as no treating physician ever removed him from work *Page 12 
or placed any type of restrictions on him due to his cervical spine condition; that he made any effort to search for suitable employment; that it would be futile for him to search for suitable employment; or that he obtained employment at a wage less than his pre-injury wage. Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits for his right shoulder conditions is DENIED.
2. Plaintiff is not entitled to any further workers' compensation benefits for his August 5, 2008 work injury to his cervical spine at this time.
3. Defendants shall pay the costs of these proceedings.
This the __ day of December 2010.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 13 
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1